# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

FILED
AUG 5 2008

RMW

No. CV 08 3750

RAUL CAMPOS,

    Petitioner,

v.

ROBERT HOREL, Warden,

    Respondent.

**PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. section 2254)**

E-filing

Mark D. Greenberg
Attorney at Law
Cal. SBN 99726
484 Lake Park Avenue, No. 429
Oakland, CA 94610
(510) 452-3126

Attorney for Raul Campos, V-68975
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95531-7000

# TABLE OF CONTENTS

PETITION FOR A WRIT OF HABEAS CORPUS     1

PRELIMINARAY ALLEGATIONS (I-III)     1

SUMMARY OF EVIDENCE PRESENTED AT TRIAL (IV)     3

CLAIM FOR RELIEF (V)     13

    *Miranda* warnings given to petitioner were ineffective because they were given long after custodial interrogation had begun.     13

EXHAUSTION ALLEGATION (VI)     29

PRAYER FOR RELIEF     30

VERIFICATION     31

# TABLE OF AUTHORITIES

**Cases**

*Berkemer* v. *McCarty*, 468 U.S. 420 (1984)     14

*Brecht* v. *Abrahamson*, 507 U.S. 619 (1993)     29

*Miranda* v. *Arizona*, 384 U.S. 436 (1966)     13

*Missouri* v. *Seibert*, 542 U.S. 600 (2004)     24,27

*Rhode Island* v. *Innis*, 446 U.S. 291 (1980)     14

*Stansbury* v. *California*, 511 U.S. 318 (1994)     14

Mark D. Greenberg
Attorney at Law
Cal. SBN 99726
484 Lake Park Ave., No. 429
Oakland, CA  94610
(510) 452-3126

Attorney for Raul Campos, V-68975
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA  95531-7000

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RAUL CAMPOS,**<br><br>           **Petitioner,**<br><br>      **v.**<br><br>**ROBERT HOREL, Warden,**<br><br>           **Respondent.** | **No. _____**<br><br>**PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. section 2254)** |

Petitioner, through his counsel, files this petition pursuant to 28 U.S.C. section 2254 *et seq.*, and alleges as follows:

## PRELIMINARY ALLEGATIONS

### I.

Petitioner is currently confined at Pelican Bay State Prison in Crescent City, California.

## II.

**A.** In an information filed on March 27, 2003, the District Attorney of San Mateo County accused Raoul Campos and Alfredo Valenzuela of four counts of murder. (Cal. Pen. Code, § 187.)  Arming (Cal. Pen. Code, § 12022(a)(1)) and personal, intentional discharge of a firearm (Cal. Pen. Code, § 12022.53(c)) were alleged against both men on the four counts of murder; also alleged were special circumstances for the murder in the course of attempted robbery (Cal. Pen. Code, § 190.2(a)(17)), murder in the course of burglary (§ 190.2(a)(17), and multiple murder (§ 190.2(a)(3)).  (CT 206-210)

**B.** Trial for each defendant was severed.  On December 16, 2004, petitioner Campos was found guilty of four counts of first degree murder, attempted robbery, and residential burglary.  All enhancement and special allegations were found true (CT 1145-1148, 1350-1362), except for the arming enhancement, which had been dismissed by the prosecution just before the beginning of the case in chief for the defense. (CT 1139-1140.)  On February 25, 2005, petitioner was sentenced to an aggregate term of life without possibility of parole with an additional term of twenty years.  (CT 1386-1388; RT 1047-1049.)

**C.** Petitioner appealed his conviction to the California Court of Appeal, First Appellate District, which, on February 27, 2007 affirmed his convictions.  On April 2, 2007, a petition for review was filed in the California Supreme Court, and review was denied on May 9, 2007.

## III.

The federal issues presented to the California Court of Appeals and the California Supreme Court were as follows:  **A.)**  Incriminating statements made by petitioner while in effective custody, but without the prelude of any *Miranda* warnings required suppression of these statements pursuant to the Fifth Amendment;  **B.)**

2

evidence from the trunk of petitioner's car was seized in violation of the Fourth Amendment and should have been reversed.

## SUMMARY OF EVIDENCE PRESENTED
## AT STATE TRIAL

### IV.

The following is a summary of the prosecution case at petitioner's state court trial:

Javier Vaca was a mid-level cocaine distributor. Although he lived in San Francisco with his girlfriend, Sugey Caro, their baby, and Caro's two brothers, Vaca maintained for business an apartment in San Bruno, rented in the name of his cousin, Jaime De Alba. The San Bruno apartment was strictly a redistribution center where the purer cocaine was diluted, repackaged, and then redelivered further down the retail line. No transactions were conducted at the San Bruno apartment in order to maintain security against police and would-be robbers. Emilio Flores, Roberto "Pecas" Ramos, and Alberto Munoz all worked for Vaca at the San Bruno apartment. Vaca's supplier was Jorge "Chico" Hernandez, who brought a shipment up from Mexico to Northern California about four times a month. (RT 208-209, 224-225, 312-316, 738-746.) Because Hernandez had no driver's license, he paid his cousin, Alfredo Valenzuela, to drive for him on these "road trips." (RT 705-706.)

Sugey Caro testified that on one occasion in August, 2001, at the San Francisco apartment she shared with Vaca, she overheard an argument between Hernandez and Vaca. The dispute was over payment. Hernandez claimed he was owed $45,000; Vaca refused to pay; and Hernandez threatened to return with some people to kill Vaca. (RT 213-215.)

Vaca took the threat seriously enough to have Caro move in with his mother, who was living in Chico. Caro nonetheless came back on occasion to San Francisco to visit her brothers, and on one of these sojourns in November, she again overheard an

3

argument between Hernandez and Vaca, again over money. Vaca refused to pay Hernandez because Hernandez's "work was worthless." He conceded he would make a partial payment directly to Hernandez's boss, Antonia, because he did not trust Hernandez to hand over the money. Hernandez, according to Caro, repeated his threat to come back and kill Vaca. (RT 216-220.) Between August and December 2001, Caro also witnessed Vaca on the telephone several times with Hernandez arguing about money. (RT 220-221.)

Mark Hachman, who lived in apartment N-6, which adjoined Vaca's apartment N-8 in San Bruno, testified that between 4:30 and 5 p.m. on January 11, 2002, he heard a group of people tramping up the outside stairway and entering the neighboring apartment. Hachman, through the wall of his apartment could hear a loud argument in Spanish accompanied by some physical commotion. Within minutes, someone in that apartment turned up the volume of the music, through which Hachman heard six or seven popping noises. The music was turned down, and Hachman could hear the sound of footsteps descending the stairway. (RT 298-304.)

Five or ten minutes after this, Oscar and Iram Caro, Sugey's brothers, drove to the San Bruno apartment. They had been called by Vaca to come pick up some money. Oscar first telephoned from outside to advise Vaca that they were there. When no one answered, Oscar ascended the stairs, walked through the open door of the apartment and saw the bodies of Vaca, Ramos, Munoz, and Flores lying dead on the floor of the apartment. Instead of calling the police, Caro telephoned Jaime De Alba, who went over to the San Bruno apartment at about 7 p.m. and called 911 when he re-discovered the bodies. (RT 231-241, 268, 316-318, 328.)

All the bodies, except Flores' were face down with the hands and feet bound by flex ties. Vaca, Ramos, and Munoz were killed in this position by shots fired with the muzzle of the gun pressed to the back of the head . Flores, who had a blunt trauma wound to the top of his head, was killed by four shots to the chest. (RT 231-240, 344, 405-407, 420-429, 456-461, 468, 472-475, 706-709.)

4

The police discovered a cell phone lying on the floor near Alberto Flores' head. The phone had no connection with any of the victims, but was registered to a Catalina Salazar, who, as it turned out, was the girlfriend of Chico Hernandez. She testified that she had opened an account on this cell phone in her name, but the phone was used by Hernandez. On January 11, 2002, she had plans to go to Las Vegas with her family. Hernandez was supposed to accompany her, but called that day to say he was enroute to San Francisco. He told her not to go to Las Vegas with her family but to remain on hand if he should call. He telephoned five or six times during the trip just to chat with her. He said he was with other people. The last call was at about 3:30 p.m., after which Hernandez telephoned again about 5 or 6 p.m., instructing her to cancel the cell phone. He told her he had a fight and had dropped his phone at he scene. (RT 332, 505-506, 508-512, 761-762.) Salazar received further calls from Hernandez, who told her that he was going to Tijuana. When she tried calling him again at the number from which he made these later calls, she was told that he had gone to Mexico. She never saw Hernandez again. (RT 513-514.)

Based on the various numbers contained in the memory of the cell phone found in the apartment, the San Bruno detectives and investigators from the San Mateo County District Attorney's office found themselves, on February 20, 2002, at an apartment complex on Estara Avenue in Los Angeles intending to canvass the occupants in three different apartments. (RT 276-277, 291, 551-552.) Before they even entered the complex, Inspector Minahan noted a white Cadillac similar in description to a vehicle reported to have been outside the San Bruno apartment about the time of the shootings. Minahan asked a bystander, who owned the Cadillac. The man turned out to be Raoul Campos's father, and he directed Minahan to his son in apartment 7, which was one of the apartments the police intended to contact. (RT 278-279, 291-293.)

Minahan and the other officers contacted Campos and informed them why they were there. Campos was willing to talk, but not in front of his mother, who was

5

present in the apartment. He suggested that they go to the nearby Los Angeles police station. There, the San Mateo officers were given permission to use the interview room, which was equipped with video equipment. The interview of Campos was taped and played to the jury. (RT 279-280, 293-294.)

The interview began with Campos admitting that he used to have a cell phone with the number (323) 719-6967, but that it did not belong to him. The phone belonged to Alfredo or Fredo, a long-time friend, whose last name Campos did not know. (CT 999-1000.) He had known Fredo since childhood. Although Fredo had moved at one point, he returned to the neighborhood about a year and a half earlier and the two friends began hanging out again together. (CT 1001-1002.)

About four or five months earlier, Campos met through Fredo a man named Chico, introduced to Campos as Fredo's cousin. Campos could see that Chico was a coke user and once witnessed him actually selling it to someone. Chico kept asking Fredo and Campos to sell cocaine for him, but Campos refused and urged Fredo to stay away from Chico. (CT 1002-1004.)

One day, -- it was a Thursday or Friday[1] --, Campos was driving around in the white Cadillac, which he had just bought from someone in the Valley. Chico and two others got into the car. Chico directed Campos to a gas station offering to fill the tank. According to Campos, this courtesy gave way to threat at the gas station when Chico ordered him to get into the passenger seat because they were going to take ride. He ordered Campos not to turn around and look at the two men in the back seat, but Campos was certain that Alfredo was not one of them. Afraid that Chico was "strapped", Campos complied, and found himself on a long road trip, with Chico plying him with beer Chico stopped to buy along the way. (CT 1005-1007, 1010-1011.)

---

[1]   January 11, 2002 was a Friday.

6

With nothing to do but drink the beer, Campos paid no attention to the route, though he remembered seeing a road sign for San Jose. When they arrived at some apartments, Chico ordered him to stay in the car as he, Chico, retrieved something from the trunk. After twenty minutes, Chico returned. The impatient Campos remarked that Chico had brought him pretty far just to do a dope deal. Chico, who looked panicked, told Campos to shut up. (CT 1007-1008.)

Pressured by the officers' expression of incredulity to the effect that Campos was not telling them the whole truth, Campos conceded, "To tell the truth, some shit went down man." (CT 1012.) Although Campos was not aware of what would happen when they were driving up north, he heard Chico shouting "at some fool." Then he heard some shots. Chico had killed the people inside the apartment. (CT 1012-1014.) Elaborating on this new information, Campos revealed that they drove up with four or five other men. Campos and one of the men waited outside while the others went upstairs. According to Campos, he himself was "buzzed" from the beer and probably drunk. He heard Chico talking to someone about money. This went on for about a minute when Chico began demanding, "Where's my shit?" After this, Campos heard firing from more than one gun. (CT 1014-1015.)

Inspector Cody, who was there with Minahan, then asserted that he knew that Campos was not outside "around the corner," but that he was "right there, okay?", to which Campos replied, "I was right there, yeah." (CT 1016.) He added that Chico had killed the people inside the apartment, but when Cody asked, "Did you kill anyone?", Campos replied, "Shit, not that I know of." (CT 1016.) As Cody kept pressing for an unequivocal admission, Minahan began looking for a "Miranda" card, whereupon Campos was advised of his rights. (CT 1016-1017.)[2]

---

[2]  Cody, who had administered the warnings, ascertained that Campos understood his rights, but did not ask Campos expressly for a waiver. Instead, he simply continued the interrogation. (CT 1017.)

What followed was a confused statement in which Campos explained that he was "buzzed" from the beer. There was an argument over money, in which one of the victims insisted he had paid Chico everything that was owed. Someone then tied up the people in the apartment and shooting started with Chico killing the man with whom he was arguing. However, one of the people in the apartment managed to charge toward Campos. Campos believed that man was attacking him. Campos, who entered the apartment without a gun, somehow obtained one and shot at his assailant three or four times. (CT 1018-1040, 1064-1067, 1079-1080, 1082; RT 296, 496-498.)

Eventually, Campos admitted that Alfredo was also there. (CT 1045-10456, 1052-1053.) In fact, the entire odyssey began about noon, when he and Alfredo were at the mall about to get something to eat, when Chico appeared and commandeered the Cadillac at the gas station. Campos speculated that Alfredo must have telephoned Chico on Campos's cell phone. (CT 1072-1074.)

In describing the way back to Los Angeles, Campos related that somewhere in San Jose the Cadillac ran out of gas. Campos left the car to cadge some money for fuel. When he returned to the car, Chico, Alfredo, and one other man inexplicably walked off. Campos speculated that Chico must have had a car ready, and noted in fact that Chico owned a light blue Mercury minivan. (CT 1041-1042, 1049-1050.) Campos and one of the other men known at "Reaper" returned together to Los Angeles. Campos dropped Reaper off at an exit in the San Fernando Valley and then proceeded back to his home in East Los Angeles. (CT 1057-1060, 1086-1087, 1090-1091.)

The circumstantial evidence presented by the prosecution tended to show planning for the January 11 "road trip" and Campos's involvement in this planning. Thus, Catalina Salazar testified that Chico Hernandez, at least as of November, 2001, owned a mini-van. (RT 507-508.) Records established that title to the van was transferred to Alfredo Valenzuela on December 6, 2001. (RT 556-557.) The Cadillac that brought Campos to the particular attention of the northern California officers was

8

not, as Campos maintained, bought from some man in the San Fernando Valley, but was transferred from Alfredo Valenzuela to Campos on December 10, 2001. (RT 557-559.) After the police recovered the Cadillac and transported it from Los Angeles to San Bruno, the car was searched and in the trunk was found a package of plastic zip ties similar to those used at the crime scene to bind the hands and feet of the victims. (RT 624.)

During the interrogation, Campos had identified a photograph of the "Reaper" (CT 1039-1040), who, it turned out, was Lazaro Perez, a friend of Chico Hernandez, with whom Hernandez shared an apartment in Southgate. (RT 500, 506.) According to Wendy Gomez, who had met Perez in November, 2001, on January 6, 2002, Perez told her he was going to make a trip to San Francisco on January 11 and invited her to come with him. She declined the invitation (RT 516-517, 527-529), but agreed to his request to transfer a van to her name. He told her she would eventually be contacted by someone named Miguel in order to effect this transaction. (RT 517-518.)

On January 12, 2002, the van in question, which was the one owned by Chico Hernandez and transferred to Alfredo Valenzuela on December 6, was videotaped by surveillance cameras crossing the Mexican border at San Ysidro 4:15 a.m. (RT 507, 519, 539.) On January 15, Wendy Gomez was contacted by Miguel, who met her in Paramount City, where they proceeded to a notary, who was paid off to approve the signatures on the title transfer. Miguel was in fact Alfredo Valenzuela, and he left the notary in the same van that now was registered to Ms. Gomez. (RT 519-527, 556-557.) The van was eventually found abandoned in Mexico, and had a secret compartment in the front, seemingly fitted for the secret transport of narcotics. (RT 559, 739-740.)

During the interrogation, Campos had referred to a cell phone, which was in his name and which he, and then Chico Hernandez, used both on the drive north and the drive back to Los Angeles. He also indicated that Alfredo had a cell phone in his own name. (CT 1041-1044, 1060, 1072, 1088-1089.) Alvaro Acosta, a cousin of Alfredo

9

Valenzuela, testified that he had worked on commission as a salesman for Cingular wireless. At the end of November, 2001, Valenzuela approached him to obtain a cell phone. Acosta was unable to open an account because of Valenzuela's poor credit. Acosta suggested that Valenzuela bring in someone else's identification and social security number. (RT 697-698.) In early December, Valenzuela, accompanied by Campos, returned with the identification and social security number of a Rosa Martinez, and with this, Acosta provided both men with cellphones. (RT 698-704.) Rosa Martinez, a complete stranger to anyone involved in the case, testified that on December 2, 2001 she had inadvertently left her purse in a shopping cart, and the purse was gone when she came back to retrieve it. The purse contained her identification and social security number. (RT 542-547.)

The records from the cellphones obtained from Alvaro Acosta, and those obtained by Catalina Salazar both for herself and for Chico Hernandez showed cross-contacts between the dates of January 9 and January 11. (RT 766.) Also, by a somewhat complex correlation of cell phone contacts between these various phones and the location of the relays, the prosecution was able to establish that on January 11, 2002, the "road-trip" occurred in two separate vehicles, leaving Los Angeles about 9:30 or 10 in the morning and arriving in the Bay Area between 4 and 5 p.m. (RT 769-777.)

In the interrogation, Campos admitted to shooting Emilio Flores when the latter rushed at him, and four .22 caliber bullets, three of which were definitively fired from the same gun, were recovered from Flores' body. But, according to the ballistics expert, the same gun also fired at least two of three bullets recovered from Javier Vaca's head, and the two bullets recovered from Alberto Munoz's head. A single bullet recovered from Ramos's body was a .45 caliber. Based on all recovered bullets and cartridges, at least four different guns had been fired at the crime scene. (RT 407, 425-427, 458-459, 470, 602-606, 613, 628-633.)

The circumstantial evidence was augmented by, as it were, quasi-direct evidence from Alfredo Valenzuela himself through his hearsay statements made to Alvaro Acosta, who had provided the cellphones to Valenzuela and Campos at the beginning of December. Acosta testified that Valenzuela came into Acosta's store in mid-January, 2002. He related to Acosta that he, Valenzuela, had been in northern California, where something went wrong, and that four people had been killed. (RT 706.) Valenzuela, who was with Chico Hernandez, went into an apartment where the residents were "acting dumb." Chico had wanted "the money", but was refused. Chico then told "them" to tie up the men in the apartment. Chico's demand was still refused all the while that the trussed up men were pleading for their lives. Chico then gave the order to kill them. According to Acosta, Valenzuela said he wanted nothing to do with killing and stepped outside as someone else began shooting the men in the head. According to Acosta, Valenzuela described how he had seen two of the men killed, how their heads bobbed when they were shot, and how they looked afterwards as though they were sleeping. According to Acosta, the conversation was interrupted because Acosta had to go back to work. (RT 706-709.)

Finally, the jury was played an audiotape of a monitored telephone call Campos made from the San Mateo County jail to his family in Los Angeles on April 22, 2002. (RT 804-807.) After talking to his mother, he asked to speak to his brother, Roberto. (CT 1117-1118.) The following discussion was captured on tape:

"R [Raoul Campos]: How you doing in, in school and stuff?

"M [Roberto Campos]: Um, good.

"R: Are you sure?

"M: Yeah.

"R: You staying out of trouble?

11

"M:  Yeah.

"R:  What about everybody?

"M:  They're cool.

"R:  Okay.  You going to your program regularly?

"M:  Uh-huh.

"R:  Serious?

"M:  Oh, today?  *Yo tengo, yo tengo todo planeado.*  [I have, I have everything planned.]

"R:  Huh?

"M:  I got everything planned.

"R:  Okay, hey (unintelligible)

"M:  Huh?

"R:  You know that yellow booklet?

"M:  Mmm-hmm.

"R:  Where I got you know uh, Stephanie on it and everything, about the emails and all that shit.

"M:  Mmm-hmm.

"R:  There's a paper that says 'the plan', something about $50,000. Rip that apart.

"M:  Okay.

"R:  Rip it out.

"M:  Mmm-hmm.

"R:  I don't want it in there.  Rip it out.

"M:  Mmm-hmm.

"R:  *Tiralo a la basura* [Throw it in the trash], I don't care.

"M:  Okay.

"R:  But I don't want it *porque si lo encuentran* [because if they find it] I'm gonna get in deep shit.

"M:  Okay.

"R:  (unintelligible)

"M:  Mmm-hmm."  (CT 1118-1119.)

Campos went on to ask his brother to send him "the two pink slips of my car" (CT 1120), and to tell "Dahlia" not to tell the investigator "about you know what . . . . "because I don't want that involved, you know?"  (CT 1122.)

## CLAIM FOR RELIEF

## V.

**_Miranda_ warnings given to petitioner were ineffective because they were given long after custodial interrogation had begun.**

1.  It is clearly settled constitutional law as established by the Supreme Court of the United States, that a criminal suspect, subjected to custodial interrogation by the police, must be advised of his right to remain silent and his right to consult with an attorney both before and during any such interrogation. (*Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966).)  For these purposes, "interrogation" "refers not only to express questioning, but also any words or a actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the

suspect." (*Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980).) "Custodial" means "any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (*Miranda, supra*, 384 U.S. at p. 444.) Whether "custody" exists against this measure must be determined against an objective legal standard: would a reasonable person in the suspect's position have believed that his freedom of action was limited in a manner akin to formal arrest. (*Stansbury* v. *California*, 511 U.S. 318, 323-324 (1994); *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984).)

2. During the interview at the Los Angeles police station, petitioner was not advised of his *Miranda* rights until long after the custodial interrogation began. (CT 1017-1018.) On this basis, he made a motion *in limine* to suppress his incriminating statements under the Fifth Amendment. He contended that the *Miranda* warnings should have issued earlier and that their belated appearance, under the totality of circumstances presented, served no protective function. (CT 463 *et seq.*) The trial court found that the warnings were appropriately given at exactly the right moment and denied the motion to suppress. (RT 85-88.)

3. The facts developed at the suppression hearing established that, based on phone numbers obtained from the cell phone abandoned at the scene of the homicide, Inspectors Cody and Minahan of the San Mateo District Attorney, and Sergeants Campi and Officer Barraza of the San Bruno police, traveled down to Los Angeles to canvass the addresses associated with these numbers and obtain whatever information they could about the homicides. Cody himself had gone to Los Angeles on an earlier week-long trip and spoke to something less than fifty people. The second trip to Los Angeles found these officers on Estara Street on February 28, 2002, intending to contact three apartments within one building, when Cody noticed a white Cadillac with tinted glass and gold rims parked outside this very apartment building. This was significant because witnesses at the San Bruno apartment had described such a car as

present at the scene in San Bruno at the time of the murders. (RT 15-19, 26, 27-29, 80.)

4. Cody asked a bystander if the latter knew who owned the car. This man, who turned out to be petitioner's father, answered Cody's question and pointed out the apartment where his son could be located. Significantly, the father had directed them to one of the apartments they were intending to contact. Cody then asked the father whether his son had taken any trips in the Cadillac, to which the father responded that his son had taken a couple of day trips some time in January. When asked where, the father answered, San Diego, but was not certain. (RT 49-50, 82-83.)

5. The officers, who were in plain clothes and driving an unmarked car that day, contacted petitioner inside the apartment. Cody informed petitioner that they were investigating a homicide in northern California. Petitioner, desiring privacy from the rest of his family, directed the officers to his bedroom. Petitioner seemed to know something about the matter, so Cody suggested that they all go to a nearby park to talk more freely. It was petitioner who suggested a nearby LAPD substation. Petitioner agreed to go in the car driven by the officers and he even directed them to the substation. In the car, petitioner exchanged small talk with Barraza. At no point did any officer mention any details about the crime to petitioner. (RT 20-23, 50-51, 62-63, 74, 83.)

6. At the station, Cody introduced himself to the local officers and obtained permission to use the interrogation room. Unknown to petitioner, the room was monitored for videotape, and this was set up before petitioner entered. Once inside, petitioner sat at a table; next to him was Inspector Cody; and opposite him sat Inspector Minahan. Sergeant Campi was also in the room but sat off to the side taking notes. Officer Barraza was down the hall in another room, monitoring the videotaping. (RT 24, 59, 71, 84.) Minahan spoke first, making a record of the time, place, and persons present, after which he addressed petitioner:

15

"IM [Inspector Minahan]:  One thing we'll get straight okay, is we're not going to bullshit each other.  We're not going to play around.  We're just going to get right to the heart of the matter.

"RC [Raoul Campos]"  Oh yeah.

"IM:  Okay?  And one of the things we do with people is we spend all day with them and we're not going to waste your time spend all day with you.

"RC:  Oh yeah I know.

"IM:  But the reasons we spend all day is because if we're not asking the exact right question, they don't give us the right information.

"RC:  Right, I--

"IM:  But what you can do  from the get go here is you can tell us everything you know about this.

"RC:  Yeah, yeah I'm gonna tell you everything man.

"IM:  So when we split at the end of the day, there's no more reason for us to contact Raoul Campos.

"RC:  Okay.

"IM:  Capice?  You got that?

"RC:  Yeah.  Yeah I got it."  (CT 865-866.)


7.  Clearly at this point this was not a custodial interrogation.  Petitioner had voluntarily gone to the LAPD substation with the officers in order to give what appeared to be a witness statement.  Nonetheless, it should be noted that 1)  the officers knew at this point that petitioner owned a Cadillac consistent in appearance with one seen in San Bruno at the time of the murders; 2) that the officers also knew at this point that petitioner knew something about these murders; and 3)  that Minahan

addressed petitioner as a witness, but in a way that indicated a belief that petitioner was a suspicious witness with perhaps some motive to prevaricate or lie.

8. The questioning then started with Minahan asking about the cell phone number (323) 719-6967, which petitioner admitted used to be his number. However, the phone was owned by his friend Fredo, whose last name petitioner did not know. (CT 866.) Cody then interrupted suggesting that the better approach would be to let petitioner give his story without questions: "Why don't you just go ahead and tell us where, just start, just start rolling." (CT 866.) Petitioner, after asking and being assured by both Cody and Minahan that the interview was not being taped (CT 867), then gave his first version, which was recounted in the statement of facts: he met Chico through Fredo; that Chico was cocaine dealer, with whom petitioner wanted nothing to do, and about whom petitioner warned Fredo; that Chico, one day, simply got into petitioner's Cadillac with two other men; that Chico, with an implied threat, commandeered the Cadillac for a drive to northern California; that they stopped at some apartments; that Chico retrieved something from the trunk of the Cadillac; that Chico went upstairs for fifteen or twenty minutes, leaving petitioner downstairs in the car; and that when Chico returned to the Cadillac, petitioner's expressed annoyance at having been dragged along on some drug deal elicited a rebuke from Chico and a warning to petitioner to shut up. (CT 871-874.)

9. Thus, at this point, petitioner provided a definitive connection between the Cadillac and the crime. Even more, petitioner raised the distinct suspicion that he, petitioner, at least aided and abetted in a drug deal and perhaps in the four murders. That this point in the interview was a significant crux was recognized by Inspector Cody, who interjected:

"IC [Inspector Cody]: Raoul, are you scared now?

"RC: Tell you the truth, I am cause –

17

"IC: Okay, well I'm telling you –

"RC: -- all this bullshit eh.

"IC: -- is, you see, you know we showed up at your house for a reason right.

"RC: Oh yeah. (unintelligible) I know you show up for a reason.

"IC: Let me tell you something. And you know like, when you go to that complex?

"RC: Yeah.

"IC: A big apartment complex, right? And ah, all those eyes looking around.

"RC: Oh yeah, yeah.

"IC: So, remember that, I want you to keep that in your head . . .

"RC: In my head –

"IC: Okay? So when you tell about that one particular part. It's the whole truth okay?

"RC: (unintelligible)

"IC: (unintelligible) I'm trying to tell you something. If things went to shit in there, okay? Now's the time to hear about it. I'm telling you.

"RC: Oh yeah." (CT 874.)

10. Petitioner then had admitted that he was with Chico Hernandez and two others in the car used to drive from Los Angeles to San Bruno where the murders occurred. Inspector Cody expressed disbelief that this was the entire story and

pressured petitioner with the warning, "Now's the time to hear about it. I'm telling you."

11. At this point, a reasonable person in petitioner's position would not believe he was free from restraint and that he was not under the effective equivalent of formal arrest. This is true here especially in light of Cody's clear implication that the police had evidence incriminating petitioner and knew what had occurred.

12. The custodial interrogation continued. While petitioner insisted that Chico had taken petitioner to northern California, and that petitioner, waiting downstairs in the car, saw nothing, Cody began asking specific questions about the length of the drive and the number of people in the car. Minahan interjected in this exchange his own incredulity that in a six hour drive petitioner never turned around to see who was in the back seat. (CT 875-876.) After the officers pressed petitioner unsuccessfully about the presence of Fredo (CT 876), the following exchange occurred:


"IC: Okay, when we went to your place.

"RC: Yeah.

"IC: You said you'll be totally honest. Okay?

"RC: Yeah I totally am. That's what I said, you know what, let's get out of here.

"IC: We're interviewing you as a witness right now.

"RC: Yeah that's what I told you when I was in my house, I told you (unintelligible)—

"IC: Okay, but you know what's the most important thing Raoul?

"RC: No.

"IM: Truth

"RC:  That's what I'm saying.

"IC:  Not half the truth.  All of the truth, okay?  'Cause you know all the stuff?  I ain't going to bullshit you.  You know the stuff we told you about people seeing stuff?

"RC:  Yeah.

"IC:  People saw the Caddy pull up in front of the place.

"RC:  Yeah I know people saw the Caddy.  That's what I'm saying.

"IC;  People saw more than one person get out of that Caddy. Okay?

"RC:  It was like I told you there was two other people.

"IC:  That's not what you told us man.  You said there were two other people in the Caddy.

"RC:  That's what (unintelligible)

"IC:  Now the people we're talking about saw a particular number. They're very clear.  Okay?  So what I'm telling you is, if some, if you are saying that you didn't know everything that was going to happen.

"RC:  Yeah.

"IC:  I'm gonna believe you.

"RC:  Yeah, I'm telling you right now I didn't know what the fuck.

"IC:  I need to know the whole shit because, if something went on in that apartment, and I do believe maybe that it was an accident, it wasn't meant to happen and you were there and you go oh fuck.  Now's the time. 'Cause this is your one big crystal opportunity to be totally truthful.  You understand what, what I'm saying to you dude?

"RC:  Yeah, (unintelligible), wait, wait, wait, like I told you, I don't like to bullshit eh.

20

"IC: Okay, now's the time now.

"IM: Now's it, now's your time man.  Go.

"IC: Did it go to shit inside there?

"RC: To tell the truth, some shit went down man.

"IC: I know.

"RC: Shit went down.

"IC: Okay.  Did you really know, when you were coming up, did you know what was going to go on up there or did he just say –

"RC: No.

"IC: -- take a road trip?

"RC: I didn't know what the fuck was going on.  He said you know what (unintelligible) car (unintelligible).

"IC: Uh, I'm going to tell you that the information we have is what happened up there.  Not necessarily wasn't supposed to happen but the problem is, is with you not being a hundred percent, that ain't gonna do you that good, okay?

"RC: Yeah.

"IC: So you said you know some stuff, and we know what kind of shit went on, okay?  You need to be totally truthful my friend.

"RC: Can I ask a couple of questions?  You know what, tell you the truth, it ain't worth it for this guy.  I don't even know this guy.  I don't want to go fucking, this jail for this fool.

"IC: That's, and that is why we're here.  We want to hear the whole truth from you.

"RC: Can I say, can I ask something, you know, I say (uintelligible) I'm telling you, I'm telling you everything I tell you everything. And I am gonna tell you the truth, eh.

"IC: Okay.

"RC: I don't want to fucking, because this fool like I'm saying ain't worth it.

"IC: Okay.

RC: I didn't even know this fool. He ain't no friend of mine, you know. Fucking is getting me into bullshit. Now, if I said anything (unintelligible) what's gonna happen to me?

"IC: We'll make some decisions, okay? We'll make some decisions, but you need to say the truth. When I tell you there's one opportunity, I'm saying there's one opportunity.

"IM : This is it.

"IC: You know, I know you're scared Raoul, okay?

"RC: Okay.

"IC: Okay? And I know some shit happened and maybe you didn't expect it to happen, okay?

"IM: But that's what we need to hear now.

"IC: Right.

"IM: So you're on man." (CT 876-878.)

13. This exchange is virtually self-explanatory and requires little or no gloss to highlight its legal significance. Petitioner and the officers themselves, as reasonable men, all by now understood and all but expressed the belief that petitioner was *not* now free to leave until he explained all these incriminating circumstances in a believable

22

manner. This is manifest in the officers' insistence that *now* was the time to clear himself, and this was the *one* opportunity to do so. For his part, petitioner evinced a correct estimate that he was going to jail unless he cleared things up. The gaping hole in this entire exchange is defined by the absence of any admonition from Cody or Minahan that they indeed were not necessarily trying to clear things up favorably for petitioner, which is to say that the missing element in this exchange were the *Miranda* warnings.

14. The further course of the questioning only strengthens this conclusion. When Minahan told petitioner, "So you're on man," petitioner offered that Chico was "the one that killed 'em." (CT 879.) Petitioner further offered that he heard Chico "shouting at some fool," after which petitioner heard some shots. (CT 879.) Cody found this unsatisfactory: "You know what? I know that. You know why you know, you're trying Raoul, you're trying. But you got to be totally truthful my friend. Because you know what? You ain't being totally truthful about what happened inside that apartment and where you were standing." (CT 879.) When petitioner began repeating the same story (CT 879-880) Minahan broke in, "And you were standing inside the apartment at this time?", to which petitioner admitted, "To tell the truth, yeah." (CT 880.)

15. Thus, the statements preceding the *Miranda* warnings should have been suppressed. But because of the belatedness of the *Miranda* warnings, the statements after they were given were also constitutionally vitiated and should have been suppressed. The governing legal principle is as follows:

> "Just as 'no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures,' [citation] . . . , it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. 'The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda*.' [Citation.] The threshold issue when interrogators question first and warn

later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of the interrogation as distinct from the first, unwarned and inadmissible segment." (*Missouri* v. *Seibert*, 542 U.S. 600, 611-612 (2004).)

16. When one applies this principle to the further interrogation, in which the officers finally give petitioner *Miranda* advisements, it becomes clear that these advisements were only an empty formality not only because they were belated but because of the manner in which they were given and minimized.

17. The full exchange up to and through the giving of the *Miranda* advisements began when Cody interrupted petitioner's attempt to explain how he had only "heard" shots even though he was present inside the apartment (CT 880-881):

> "IC: Okay, all I'm telling you is, you need to be more up front. You see what I'm saying? I mean, because we know what happened in the apartment. I'm done, we're, we're talking to people my friend.
>
> "RC: Oh I know it (unintelligible).
>
> "IC: So the thing is and you ain't sitting, you know, outside, around the corner, you're right there, okay?
>
> "RC: I was right there, yea.
>
> "IC: I'm gonna give you a clue, okay?

24

"RC: I'm telling you the truth sir. This guy, he's the one who killed them, man. I saw this guy, and you know, like I said, I was already, we were drinking beers, you know.

"IC: Did, let me see –

"RC: I was fucking buzzing, drunk, I'm not sure.

"IC: Did you kill anyone?

"RC: Shit, not that I know of.

"IM: That's not the right answer.

"IC: Okay, I know things happen.

"RC: (unintelligible) Oh I know things happen.

"IC: Things happen, okay?

"IM: You had, you had a gun when you went in, Chico gave you a gun when he walked in the door.

"RC: I told you it's not when he's there. I, I saw the other guy that he fought with us. He took out a, a big gun. He took out a big gun. But I was already in a buzzing, nervous. I'm not sure what the, all I know that shots went off. Went off and—

"IM: Looking for a card.

"IC: Yeah. I got one.

"IC: Okay, this is what I want. I need you to be totally up front man. Do you understand me?

"RC: Yeah, I understand you. I'm up front with you sir.

IC: I mean totally, okay?

"RC: Yeah.

"IC: I'm going to read you your rights, okay? Oh, all I'm going to tell you though, just listen to them and be honest, okay? Alright. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one would be appointed to represent you before any questioning if you wish one. Do you understand each of these rights that I've explained to you?

"RC: Yes.

"IC: Okay.

"IM: Okay, now –

"IC: Raoul, my friend. I'm going to tell you something, okay man? No. B.S.

"RC: Alright, okay.

"IC: I believe you. And I know this wasn't your idea.

"RC: Oh I know that.

"IC: And I know that you got in caught in the middle of something. That went to shit. Okay?" (CT 881-882.)[3]

18. There are two considerations crucial to evaluating the effectiveness of the warnings here. First, petitioner had already made severely incriminating admissions that his car had transported the killers to the scene of the murder; that petitioner himself was physically present inside the apartment where the murders occurred; and that petitioner may have fired a gun inside that apartment at the time of the murders. The need to explain these facts, which might not have been elicited had warnings been

---

[3] The interrogation went on after this with petitioner admitting to his having shot Emilio Flores. The entire interrogation took two hours and 12 minutes, at the end of which petitioner was formally arrested. (RT 84; CT 961 *et seq.*)

given in a more timely fashion, served to render *belated* warnings without any real protective purpose. (See *Missouri* v. *Siebert*, *supra*, 542 U.S. at pp. 612-614.)

19. Secondly, and consistently with the first consideration, Cody's manner of interjecting the warnings conveyed the clear implication that they were a superfluous formality and that petitioner of course was going to continue to talk to the officers:

> "IC: Okay, this is what I want. I need you to be totally up front man. Do you understand me?
>
> "RC: Yeah, I understand you. I'm up front with you sir.
>
> "IC: I mean totally, okay?
>
> "RC: Yeah.
>
> "IC: I'm going to read you your rights, okay? *Oh, all I'm going to tell you though, just listen to them and be honest, okay?* Alright. You have the right to remain silent. . . ." (CT 882., emphasis added.)

20. Of course the admonition to be honest presupposed that petitioner was going to waive his rights, a presupposition Cody did not even bother to verify:

> "IC: . . . . Do you understand each of these rights that I've explained to you?
>
> "RC Yes.
>
> "IC: Okay.
>
> "IM: Okay, now –
>
> "IC: Raoul, my friend. I'm going to tell you something, okay man? No. B.S.
>
> "RC: Alright, okay.

27

"IC: I believe you. And I know this wasn't your idea.

"RC: Oh I know that.

"IC: And I know that you got in caught in the middle of something. That went to shit. Okay?" (CT 882.)

21. If further proof is required that the *Miranda* warnings when and as given were purposeless and ineffective, one need only consult the later part of the interrogation. Once Minahan and Cody obtained petitioner's unequivocal admission that he had shot Emilio Flores and petitioner's version of the strange trip back to Los Angeles, they left the room, leaving petitioner alone with Sergeant Campi. (CT 953; RT 60.) At this point, petitioner asked Campi, "Do I still need a lawyer or something? No? Not really?" (CT 954.) Campi did not answer. (RT 61, 63-64.) When Minahan and Cody returned, Cody said, "A few more questions for you that we like to talk about," to which petitioner responded "I got a friend, he's a lawyer. I don't know do I really need one or . . . ." at which point static obliterated the rest of the sentence, and none of the officers present remembered what was said. (CT 961; RT 58, 62, 70-73.) These questions need not have been asked if the *Miranda* warnings had been effectively given in a timely fashion.[4]

22. The admission of petitioner's extrajudicial statements was prejudicial. The axis on which the prosecution's case against petitioner revolved was petitioner's admission that he had shot Emilio Flores. This was so because it not only established petitioner as the direct perpetrator of the homicide of Flores, but also the direct perpetrator of the homicide of Vaca and Munoz, who were pierced by bullets shot from the same gun that fired the fatal bullets into Flores. Without petitioner's admission of this the prosecution's case against petitioner would have rested on circumstantial

---

[4] The interrogation ended with petitioner's formal arrest. (CT 961 *et seq.*) The entire session took two hours and twelve minutes. (RT 84.)

evidence that petitioner, involved somehow in the event, was not dispositively involved in criminal liability for the murders, since the evidence allowed for a conclusion that petitioner did not know Chico Hernandez's full purpose. The constitutional error thus had a substantial and injurious impact on the outcome of petitioner's trial. (*Brecht* v. *Abrahamson*, 507 U.S. 619, 637-638 (1993).)

## EXHAUSTION ALLEGATION

## VI.

1. The claim for relief presented in this petition have been presented both to the California Court of Appeal and to the California Supreme Court, and all state remedies have been exhausted. No other petition or appeal is currently pending in any court in regard to the judgment of conviction now under attack.

2. However, if this Court deems that any claim for relief presented in this petition has not been exhausted, Petitioner would request that proceedings in this Court be stayed and held in abeyance pending Petitioner's seeking of relief in the California Supreme Court for any unexhausted claim.

## PRAYER FOR RELIEF

**Wherefore,** petitioner prays that this Court grant him the relief to which he may be entitled in this proceeding, and if to do so, proceedings must be stayed and held in abeyance pending state exhaustion of any unexhausted claim, petitioner would request that this also be granted.

Dated: August 4, 2008

Respectfully submitted,

Mark D. Greenberg
Attorney for Petitioner

## VERIFICATION

I, Mark D. Greenberg, declare:

I am attorney for petitioner in the above-titled action. I have read the foregoing allegations contained in this petition for a writ of habeas corpus. These allegations and representations are, of my knowledge true and correct. My offices are in Alameda County; consequently, I am making this verification in place of petitioner because petitioner is incarcerated in Del Norte County, and for that reason cannot personally make this verification.

I declare under penalty of perjury that this declaration is true and correct and was executed on August 4, 2008 at Oakland, California.

Mark D. Greenberg
Attorney for Petitioner

[CCP Sec. 1013a(2)]

The undersigned certifies that he is an active member of the State Bar of California, not a party to the within action, and his business address is 484 Lake Park Ave., No. 429, Oakland, California; that he served a copy of the following documents:

FEDERAL WRIT OF HABEAS CORPUS

by placing same in a sealed envelope, fully prepaying the postage thereon, and depositing said envelope in the United States mail at Oakland, California on August 4, 2008, addressed as follows.

California Attorney General
455 Golden Gate Avenue, Ste. 11000
San Francisco, CA  94102-3664

Raul Campos, V68975
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA  95531-7000

Mark D. Greenberg
Attorney at Law