**E-FILED on** 4/19/12

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RAUL CAMPOS,<br><br>    Petitioner,<br><br>    v.<br><br>ROBERT HOREL, Warden,<br><br>    Respondent. | No. C-08-03750 RMW<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY<br><br>**[Re Docket No. 1]** |

Petitioner filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and a supporting memorandum of points and authorities addressing the merits of the petition. Petitioner did not file a traverse. Having considered the papers submitted by the parties and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief and denies the petition.

**I. BACKGROUND**

On December 16, 2004, petitioner was found guilty by a San Mateo County jury of the following charges: count one–murder of Javier De Alba Vaca (Cal. Penal Code, § 187(a)); count two–murder of Jose Alberto Munoz-Lopez (Cal. Penal Code, § 187(a)); count three–murder of

Emilio Alba Flores (Cal. Penal Code, § 187(a)); count four–murder of Roberto Ramos Guerra (Cal. Penal Code, § 187(a)); count five–attempted first degree robbery (Cal. Penal Code, §§ 664/212.5(a)); count six–first degree burglary (Cal. Penal Code, § 460(a)). The jury also found the following special circumstances to be true: (1) the murders were committed in the commission of attempted robbery (Cal. Penal Code, § 190.2(a)(17)); (2) the murders were committed in the commission of first or second degree burglary (Cal. Penal Code, § 190.2(a)(17)); and (3) petitioner committed multiple murders (Cal. Penal Code, § 190.2(a)(3)). The jury found true several other enhancements: allegations that a principal was armed with a firearm in the commission or attempted commission of the charged offense (Cal. Penal Code, § 12022(a)(1)), and that petitioner personally and intentionally discharged a firearm (Cal. Penal Code, § 12022.53(c)). CT 1145-1147, 1349-1362; RT 972-979.

On February 25, 2005, the court imposed four separate indeterminate terms of life without the possibility of parole. It also imposed a 20-year enhancement term for the personal and intentional discharge of a firearm enhancement (Cal. Pen. Code, § 12022.53(c)) attached to count three.

Petitioner's judgment was affirmed by the California Court of Appeal on February 22, 2007. He filed a petition for review in the California Supreme Court which was summarily denied on May 9, 2007. Petitioner filed the instant petition on August 5, 2008, raising the same challenges to his conviction as raised on direct appeal. Respondent filed an answer on September 16, 2010. Petitioner was granted an extension until November 17, 2010 to file his traverse to respondent's answer but failed to file any traverse.

The following facts surrounding the incident are taken from the opinion of the California Court of Appeal:

> One of the victims, Javier Vaca, had been in the business of distributing cocaine. Jorge Hernandez, known as "Chico," was his supplier. Vaca used a San Bruno apartment for business purposes. In 2001, Vaca and Chico had a falling out over a shipment of cocaine Vaca apparently believed to have been worthless, so that he refused to pay Chico for it. Vaca's wife overheard them arguing about it, hearing Chico tell Vaca that if he didn't pay up, Chico would be bringing people in to kill him. On January 11, 2002, Vaca's brother-in-law found Vaca and three other men dead in the apartment. Vaca, and two of the other victims, Jose Alberto Munoz-Lopez and Roberto Ramos-Guerra, were face down on the floor with their hands tied behind their backs with zip ties. Two of them had their legs crossed. All

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No. C-08-03750 RMW
GS 2

three had been shot in the head at close range. The fourth victim, Emilio Alba-Flores, had been shot multiple times, and also had a scalp laceration indicative of having been struck in the head. It appeared that four different guns had been used against the victims. Three .22 caliber bullets were recovered from Flores, two from Vaca and two from Munoz-Lopez. Ramos-Guerra had been shot twice with a .25. A .45 caliber bullet was recovered from under Ramos-Guerra's head.

The police found approximately 13 1/2 kilos of cocaine in the apartment, which suggested the apartment had been used as a distribution repackaging safe house. They found expended bullets and shell casings. They found a cell phone on the floor next to one of the victims. They learned there had been a white Cadillac in front of the apartment building at the time of the killings.

The cell phone was traced to a woman who had been in a relationship with Chico. She testified Chico had called her at approximately 6:00 p.m. on January 11, telling her to cancel the phone. He called again, telling her he was going to Tijuana. That was the last time she ever heard from him. A police investigation of phone numbers from the cell phone led them to Los Angeles, and, ultimately, on February 28, 2002, to an apartment building on Estara Avenue. A white Cadillac was parked in front of the building. A man standing nearby told them it belonged to his son, [petitioner], and directed them to the family's apartment. [Petitioner] was there. He told the officers he would talk to them, but did not want to talk in front of his mother, who also was in the apartment.

[Petitioner] suggested they go to a nearby police station. The officers took [petitioner] to the police station, where they were permitted to use an interview room. [Petitioner] made a statement, which was videotaped and played for the jury. [Petitioner] stated that Chico had driven the Cadillac from Los Angeles to San Mateo. [Petitioner] and two other men were passengers. [Petitioner] stated he did not know the purpose of the trip and simply had waited in the car while Chico went into the apartment. [Petitioner] later admitted he had gone into the apartment, and was there when the victims were shot. He then admitted he might have shot one of the victims, stating that he thought the victim was coming after him. He thought he might have fired the gun five times. [Petitioner] explained there was a lot of commotion. He was present, as were the other men from the car, and a fifth man, who may have been waiting for them at the apartment. At some point [petitioner] became aware that the victims had been cuffed. He thought the man who had been waiting at the apartment must have brought the cuffs. Chico told one of the other men, [petitioner's] friend, Fredo, to search the apartment. Chico was arguing with one of the victims. Chico then pulled out a little gun and shot the victim. Someone else shot a second victim. [Petitioner] shot the man who charged him. Someone else shot the fourth victim after pushing him. They started to leave and someone noticed one of the victims was still alive so someone went back. [Petitioner] heard another shot. They all left and drove back towards Los Angeles. When they got to San Jose, they ran out of gas and Chico and two of the others walked away. [Petitioner] made it back to Southern California with the other man.

After taking [petitioner's] statement, the police returned to [petitioner's] apartment complex, where they arranged to have the Cadillac towed to a storage facility in Los Angeles, and later to San Mateo. They found a package of plastic zip ties in the car's trunk. The ties were made by the same manufacturer that made the ties used to bind the victims' hands. The police also retrieved a cell phone from [petitioner's] apartment. The phone was one that had received calls from the phone found in the San Bruno apartment.

The defense was that [petitioner] had not been part of a plan to kill the victims, was present only because Chico had commandeered [petitioner's] car, personally had shot only Alba-Flores, and shot only because he thought Alba-Flores was charging him.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No. C-08-03750 RMW
GS                                                        3

*People v. Campos*, No. A109411, 2007 WL 594418, at *1-2 (Cal. App. 1 Dist. Feb. 27, 2007) ("Op.").

## II.  ANALYSIS

### A.  Standard of Review

A court may grant a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).  The court may grant the writ only if the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a state court's decision to be contrary to clearly established federal law, it must apply a rule that contradicts the governing law set forth in Supreme Court cases, or confront a set of facts that are materially indistinguishable from a Court decision and nevertheless arrive at a different result from Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).  A state court decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The court cannot grant a habeas petition as being an "unreasonable application" of federal law merely because in its opinion the law was incorrectly applied in a case. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  Rather, the state court's application of federal law must be "objectively unreasonable" in order to justify granting the petition. *Id.*  The review of state court decisions is highly deferential, and state court decisions should be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

### B.  Petitioner's Claims

Petitioner claims that incriminating statements he made during an interview at the Los Angeles police station were admitted into evidence in violation of the Fifth Amendment because the *Miranda* warnings were ineffective because given after custodial interrogation had begun.

#### 1.  Custodial Interrogation

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No. C-08-03750 RMW
GS                                                                4

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statements made during custodial interrogation can be admitted in evidence. The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir.2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir.2004). Habeas relief should be granted if the admission of statements in violation of *Miranda* had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 1010 (quoting *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)). *Miranda* requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. These warnings must precede any custodial interrogation. *See Miranda*, 384 U.S. at 444.

*Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* A person is not in custodial interrogation simply because the questioning takes place at a police station or because the person is a suspect. *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). To determine whether a suspect was in custody, the court first examines the totality of the circumstances surrounding the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Taking into account the totality of the circumstances, the court must determine whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 & n.35 (1984). This determination requires an objective standard not based on the intent of the police or the belief of the accused. *Stansbury v. California*, 511 U.S. 318, 323 (1994). "The following factors are among those likely to be relevant to deciding that question: '(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'" *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (quoting *United States v. Hayden*, 260 F.3d 1062,

1066 (9th Cir. 2001)); *see also United States v. Bassignani*, 575 F.3d 879, 883–84 (9th Cir. 2009) (noting that these five factors are not exhaustive).

The language used by officers to summon petitioner does not suggest custodial interrogation. The San Bruno police officers and inspectors from the San Mateo District Attorney's office were in plain clothes and driving an unmarked car the day they contacted and interviewed petitioner. RT 82-84. They first approached petitioner at his apartment and only took him to the police station after he indicated he had information but did not want to speak in front of his family. *Id.* Petitioner voluntarily accompanied them to the station. In cases where an interrogation has been found non-custodial, the Ninth Circuit has emphasized the fact that defendant agreed to accompany officers to a police station or interrogation room. *Bassignani*, 575 F.3d at 884; *see also Kim*, 292 F.3d at 974–75 ("If the police ask-not order-someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter."). Furthermore, at the station he was told: "[Y]ou can tell us everything you know about this. . . . So when we split at the end of the day, there's no more reason for us to contact Raul Campos." RT 866. Based on the language used and petitioner's voluntary agreement to accompany the officers, a reasonable person in petitioner's situation would feel he could terminate the interview and leave. Thus, the first factor weighs against a finding that petitioner was in custody pre-advisement.

The limited evidence of guilt with which defendant was confronted also does not suggest custodial interrogation. Throughout the pre-advisement interview, the officers emphasized that petitioner needed to tell them the whole truth. *See United States v. Miller*, No. CR 09-2292-TUC-FRZ, 2011 WL 1325225, at *12 (D. Ariz. Feb. 10, 2011) (finding that agent's encouragement of defendant to do the right thing did not weigh in favor of a finding that defendant was in custody). The police did not present petitioner with a police report or any other physical evidence during pre-advisement interview or suggest that they thought he was guilty. The inspector indicated that they knew about the phone number of the cell phone petitioner used, that petitioner's Cadillac was involved, and that they showed up at his apartment for a reason. CT 866, 874. They also indicated that they knew the number of people who exited the Cadillac. CT 877. The officer's use of this information is not inconsistent with an interview of a scared witness who might be reluctant to

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No. C-08-03750 RMW
GS      6

1    implicate friends and acquaintances. Thus, the second factor weighs against a finding that petitioner
2    was in custody pre-advisement.
3        The physical surroundings of the interview do suggest custodial interrogation. The interview
4    took place in one of the station's interview rooms. There were three officers in the interview room
5    with petitioner. CT 84. However, while a police interview room inherently has a coercive nature to
6    it, that does not necessitate custodial interrogation. *See Beheler*, 463 U.S. at 1125. At no point
7    during the transport to the station or the pre-advisement interview was petitioner physically
8    restrained. Op. at *4. Petitioner was not aware that the interrogation room was set up for
9    videotaping, nor was he told he could not leave. Pet. ¶ 6; *see also* RT 867. Given that the location
10   of the interview was of petitioner's own making, petitioner was not physically restrained or told he
11   could not leave, and petitioner was told the interview would not be recorded, the coercive
12   atmosphere of the interview room was largely mitigated. Thus, the third factor weighs only slightly
13   in favor of a finding that petitioner was in custody pre-advisement.
14       The short duration of the pre-advisement interview does not suggest custodial interrogation.
15   The interview began shortly after petitioner arrived at the station with the officers. Op. at *4. The
16   interview lasted for approximately 21 minutes before the officers advised petitioner of his Miranda
17   rights. RT 85; *see also United States v. Hayden*, 260 F.3d 1062 (9th Cir. 2001) (finding that a 20
18   minute interview was not excessive). Further, at the start of the interview, one of the inspectors told
19   petitioner: "[W]e're not going to bullshit each other. . . . [A]nd one of the things we do with people is
20   we spend all day with them and we're not going to waste your time spend[ing] all day with you." RT
21   865. Given the brief amount of time before *Miranda* warnings were given and the inspector's
22   statement that they would not waste petitioner's time, the fourth factor weighs against a finding that
23   petitioner was in custody pre-advisement.
24       The degree of pressure applied to detain petitioner also does not suggest that he was in
25   custody prior to being warned. Where the questioning is generally "open and friendly" and the
26   defendant participates actively, this factor weighs against a finding of custody. *Bassignani*, 575 F.3d
27   at 884-885 & n.7. Conversely, where the interrogator "adopts an aggressive, coercive, and deceptive
28   tone," the factor weighs in favor of custody. *Id.* Here, petitioner actively participated in the

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No.
C-08-03750 RMW
GS                                        7

1 conversation and expressed a desire to be cooperative. He was not physically restrained or told he 2 could not leave. The investigator did not adopt an aggressive, coercive, or deceptive tone, though he 3 did question the veracity of petitioner's statements at several points.

4 Petitioner contends that "the officers' insistence that *now* was the time to clear himself, and 5 this was the *one* opportunity to do so" indicated that petitioner was not free to leave. Pet. ¶ 13. 6 Petitioner had expressed a desire to leave when he said, "[Y]ou know what, let's get out of here." 7 CT 876. The investigator convinced petitioner to stay by telling him that he was being interviewed 8 as a witness, that the investigator would believe him if he said he didn't know everything that was 9 going to happen, and that "this is your one big crystal opportunity to be totally truthful." *See id.* at 10 876-877. Convincing petitioner to stay by explaining that he had an opportunity to clear things up 11 by telling the truth was not pressure to confess or an indication that petitioner would go to jail if he 12 did not clear things up. In *Mathiason*, a police officer told defendant that the police believed he had 13 been involved in a burglary and his truthfulness possibly would be considered by the district 14 attorney or judge. *Mathiason*, 429 U.S. at 493. The Supreme Court found "no indication that the 15 questioning took place in a context where [the defendant's] freedom to depart was restricted in any 16 way." *Id.* at 495. A reasonable person in petitioner's position might believe that if he did not 17 cooperate, he might later be questioned as a suspect, but just as in *Mathiason*, there was no 18 indication that petitioner could not terminate the interview and leave at that moment. Thus, the final 19 factor weighs against a finding that petitioner was in custody pre-advisement.

20 Thus, taking all the circumstances surrounding the pre-advisement interview into account, a 21 reasonable person would not "have felt he or she was not at liberty to terminate the interrogation and 22 leave." *Thompson*, 516 U.S. at 99. The interview had therefore not transformed into a custodial 23 interrogation prior to the administration of *Miranda* warnings.

24 The test for custody is a general standard, and as such, state courts are entitled to "more 25 leeway . . . in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 26 U.S. 652, 664-65 (2004) (finding that the state court's determination was a reasonable application of 27 law because it fit within the matrix of the Supreme Court's prior decisions). Although there exist 28 some factors suggesting petitioner was "in custody" prior to administration of *Miranda* warnings, the

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No. C-08-03750 RMW
GS                                    8

1  state court weighed those factors and others and determined that petitioner was not in a custodial
2  status. The state court's weighing of the factors and application of clearly established law was
3  reasonable. *See Stanley v. Schriro*, 598 F.3d 612, 618-19 (9th Cir. 2010) (citing *Yarborough* and
4  denying habeas relief because "the state court delineated and weighed factors comparable to those
5  the Supreme Court has considered").

### 2. Post-advisement Statements

7  Petitioner also argues that his post-advisement statements should be suppressed because his
8  admissions in response to pre-advisement interrogation tainted the voluntariness of his alleged
9  waiver of rights after he was given the *Miranda* warnings. Petitioner's reliance on *Missouri v.*
10 *Seibert*, 542 U.S. 600 (2004), is inapposite. In *Seibert*, the defendant had been subject to custodial
11 interrogation before advisement of his *Miranda* rights. *Id.* Here, as discussed above, petitioner was
12 not subject to custodial interrogation prior to administration of *Miranda* warnings.

13 In *Oregon v. Elstad*, 470 U.S. 298, 314 (1985), the Supreme Court held that "absent
14 deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a
15 suspect has made an unwarned admission does not warrant a presumption of compulsion. A
16 subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but
17 unwarned statement ordinarily should suffice to remove the conditions that precluded the admission
18 of the earlier statement." Here, there is no evidence that the interviewers engaged in deliberately
19 coercive or improper tactics in obtaining petitioner's initial statements. Petitioner's post-advisement
20 statements were therefore admissible.

### III. CONCLUSION

22 For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall
23 enter judgment and close the file.

### IV. CERTIFICATE OF APPEALABILITY

25 The federal rules governing habeas cases brought by state prisoners require a district court
26 that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See*
27 Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. § 2254 (effective December 1, 2009). For the
28 reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No.
C-08-03750 RMW
GS                                              9

**United States District Court**
For the Northern District of California

1  debatable whether the petition states a valid claim of the denial of a constitutional right [or] that
2  jurists of reason would find it debatable whether the district court was correct in its procedural
3  ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

8  DATED: April 19, 2012

*Ronald M. Whyte*

9  RONALD M. WHYTE
   United States District Judge

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY—No. C-08-03750 RMW
GS                                          10